1

2

3                          UNITED STATES DISTRICT COURT

4                        NORTHERN DISTRICT OF CALIFORNIA

5

6    SHAWN ALLS,                                    No. C 05-0901 PJH (PR)

7                   Plaintiff,                      **ORDER GRANTING
                                                    DEFENDANTS' MOTION FOR**
8        v.                                         **SUMMARY JUDGMENT AND
                                                    DENYING PLAINTIFF'S**
9    M. FRIEDMAN, M.D.; J. WOODFORD,                **MOTION FOR PARTIAL
     Director, CDCR; DR. AUNG; DR. LUCA;            SUMMARY JUDGMENT AND**
10   DR. FREDERICK,                                 **MOTION TO APPOINT
                                                    COUNSEL**
11                 Defendants.
     _____/              (Docket Nos. 17, 19, 31)
12

13

14          Plaintiff, a California state prisoner currently incarcerated at the Correctional Training

15   Facility ("CTF") at Soledad, has filed this pro se civil rights complaint alleging deliberate

16   indifference to medical needs.  Plaintiff has filed a motion for partial summary judgment and

17   motion to appoint counsel, and defendants have filed a motion for summary judgment.  The

18   court finds the matters suitable for decision without oral argument.  For the reasons set

19   forth below, the court will grant defendants' motion for summary judgment, and deny

20   plaintiff's motion for partial summary judgment and motion for appointment of counsel.

21                              **PROCEDURAL HISTORY**

22          On January 12, 2005, plaintiff filed a complaint pursuant to 42 U.S.C. § 1983 in the

23   District Court for the Eastern District of California.  The action was transferred to the

24   Central District, which then transferred the action to this court.  On April 11, 2006, the court

25   dismissed the claims against defendant Frederick, and granted leave to amend the

26   complaint.  Plaintiff filed an amended complaint on May 22, 2006.  The court issued an

27   order of service on defendants Friedman, Woodford, Aung and Luca.  Defendants filed a

28   motion to dismiss which the court granted in part, dismissing all claims against defendants

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   Friedman and Woodford, and dismissing the state tort claims against defendants Aung and

2   Luca.  *See* Order Granting in Part and Denying in Part Defendants' Motion to Dismiss,

3   entered March 15, 2007 (doc. no. 12).  Defendants Aung and Luca filed an amended

4   answer to the remaining claims in the amended complaint on March 29, 2007, and filed the

5   present motion for summary judgment on May 27, 2008.

6        Plaintiff filed a motion for partial summary judgment and motion to appoint counsel

7   on November 29, 2007.  Plaintiff has also submitted to the court a "request for production of

8   documents" and a "motion for interrogatories."  To the extent that plaintiff seeks to compel

9   responses to his requests for discovery, such motion is denied in light of the court's ruling

10  granting defendants' motion for summary judgment.

11                        **STATEMENT OF FACTS**

12       Plaintiff is a state prisoner serving a twenty-five years to life sentence on one count

13  of conspiracy to commit murder and one count of attempted murder.  Feudale Decl. Ex. C.

14  During the time period from October 2002 to May 2003, plaintiff was incarcerated at CTF.

15  *Id.* Ex. B.

16       Defendant Htay Aung ("Dr. Aung") is a physician who has served as a Physician and

17  Surgeon for the California Department of Corrections and Rehabilitation (CDCR) at CTF

18  since 2002.  Aung Decl. ¶ 1.  Defendant Nicolae Luca ("Dr. Luca") has been a Physician

19  and Surgeon for the CDCR since 2001, and worked at CTF from 2002 to 2006.  Luca Decl.

20  § 1.  As of January 2007, defendant Luca has worked for CDCR's Quality Management

21  Assessment Team.  *Id.* § 2.

22       Plaintiff summarizes the facts supporting his claim as follows:

23            In 2002 plaintiff had the fungus disease Valley Fever, though he
         did not know it.  He suffered from chest pain, dry cough, headaches,
24       fever, weight loss, loss of strength and aching bones.  On 10-27-02 he
         passed out and was transported to the infirmary on an emergency
25       mobile gurney complaining of chest pain.

26            On 10-28-02 he was taken to the infirmary.  Defendant Aung
         ordered an [sic] chest x-ray which showed no problem and prescribed
27       antibiotics, antihistamines and Tylenols as treatment for a cold.
         Plaintiff's condition worsened.  He began vomiting, allegedly as a result
28       of the antibiotics.  He asserts that Dr. Aung's decision to take the

                                      2

United States District Court

For the Northern District of California

1    easier course of treating plaintiff's medical problem as a cold, rather
2    than investigating further, was influenced by a state budget crisis which
     had resulted in pressure to cut cost.

3         On October 29, 2002, plaintiff saw defendant Luca.  He vomited
4    several times in the course of the examination.  Defendant Luca sent
     him to an outside hospital.  At the hospital a tear in his "chest tissue"
5    was found and blood in his urine, but apparently Valley Fever was not
     diagnosed.  When he returned to the prison Defendant Luca found he
6    was running a high fever and committed him to the infirmary for three
     days.  On November 21, 2002 Defendant [Luca] diagnosed plaintiff
7    with Valley Fever and began treatment [ketoconazole].  After two
     month[s] Defendant Luca took him off the treatment despite his pleas
8    that he still had symptoms.  Plaintiff asserts that [t]he lack of proper
     care and in particular Defendant Luca taking him off treatment too
9    soon, was cause[d] by the state budget crisis.

     . . .

10

11        [In] May 2003 a biopsy was done [on] plaintiff[.  T]he test
     reveal[ed] that the Valley Fever had spread.  Plaintiff was prescribe[d]
12   a different brand of medication to treat the Valley Fever (Difluca[n]).
     Plaintiff has been on this medication from May 2003-2008.  I would like
13   to note that the doctor will be removing off the medication within weeks
     based on the spinal tap results.

14   Pl's Brief in Opp. to Defs' Sum. J. Mot. (doc. no. 36) at 2-3, 6.

15        The record contains evidence that Valley Fever (coccidioidomycosis) is an unusual

16   disease which is not easily detected.  Aung Decl. ¶ 12; Luca Decl. ¶ 3.  Valley Fever is a

17   fungal disease contracted by breathing spores of the fungus coccidioides into one's lungs.

18   Luca Decl. ¶ 3.  An infected person may develop flu-like symptoms, and in some cases

19   joint aches or skin rashes may occur, but many infected individuals will have mild

20   symptoms or none at all, and only about one percent of infected patients will require

21   treatment for Valley Fever.  *Ibid.*  Valley Fever often requires a series of tests to be properly

22   diagnosed, often taking three or four weeks for test results to return before Valley Fever is

23   discovered.  Aung Decl. ¶ 12.  Valley Fever can be treated with or without oral antifungal

24   medications, which are recommended only for patients with severe disease activity due to

25   the possible harmful side effects, including liver toxicity, hepatitis, or even death.  *Ibid.*;

26   Luca Decl. ¶ 4.

27

28        The record contains evidence that on his October 28, 2002, visit to the CTF medical

United States District Court

For the Northern District of California

clinic, plaintiff complained of chest pains and cough with yellow phlegm.  Aung Decl. ¶ 5;
Feudale Decl. Ex. E at 002.  *See* Am. Compl., Attach. at 4.  Dr. Aung pressed on plaintiff's
chest to determine the source of pain, listened to plaintiff's breathing and heartbeat and
observed that his chest sounded clear and his heartbeat was normal, and noted that
plaintiff was running a mild fever of 99.7 degrees, but his blood pressure, heart rate and
respiratory rate were within normal range.  Aung Decl. ¶ 6.  Dr. Aung did not observe any
serious medical condition but believed plaintiff may have had bronchitis, pneumonia or
possible inflammation of the bones and/or cartilage.  *Id.* ¶ 7.  Dr. Aung ordered chest x-
rays, which revealed on preliminary review that plaintiff had no acute infection in his lungs.
*Id.* ¶ 8; Feudale Decl. Ex. E at 005.  Concerned about the mild fever and symptoms,
however, Dr. Aung treated plaintiff for possible bronchitis or walking pneumonia by
prescribing antibiotics (erythromycin), and prescribed Tylenol and Robitussin in an effort to
reduce plaintiff's fever and suppress his cough.  Aung Decl. ¶ 8; Feudale Decl. Ex. E at
004.  Dr. Aung also ordered plaintiff to three days of bed rest.  Aung Decl. ¶ 8.  Based on
his review of plaintiff's medical records over the past six years indicating multiple
complaints of chest pains and frequent urination, which are common symptoms of anxiety
or other mental disorders, Dr. Aung referred plaintiff for a mental health evaluation.  *Id.* ¶ 9;
Feudale Decl. Ex E at 006.

On October 29, 2002, plaintiff returned to the CTF medical clinic for an emergency
visit and was seen by Dr. Luca.  Luca Decl. ¶ 6.  Dr. Luca states that plaintiff complained of
sharp chest pain, fast heartbeats, trouble lying on his left side, nausea, pain near his navel,
and vomiting.  *Ibid.*  Dr. Luca examined plaintiff and observed that he had a high fever, but
his chest was clear.  *Ibid.*  Dr. Luca ordered an electrocardiogram for plaintiff which came
back normal.  *Ibid.*  Dr. Luca ordered that plaintiff be taken to Natividad Hospital in Salinas,
where the attending physician ordered a catscan of plaintiff's abdomen and chest x-ray,
both of which came back with normal results.  *Ibid.*; Feudale Decl. Ex. E at 008-10.

On October 31, 2002, plaintiff returned to the CTF clinic for a follow up visit with Dr.

**United States District Court**
For the Northern District of California

1   Luca. Luca Decl. ¶ 7. Plaintiff informed Dr. Luca that the hospital doctors found a small

2   tear in the muscle tissue in his chest. *Ibid.* When asked about exercise, plaintiff told Dr.

3   Luca that he ran about eighteen minutes every three days and did about 300 push-ups

4   twice a week. *Ibid.* Dr. Luca took a urinalysis, which showed no signs of blood in plaintiff's

5   urine, but a physical examination revealed that plaintiff was running a high fever. *Ibid.*

6   Based on plaintiff's symptoms and exercise history, Dr. Luca suspected that he could have

7   rhabdomyolisis, or muscle damage which causes release of proteins. *Ibid.* Dr. Luca

8   ordered that plaintiff be sent to the infirmary for three days and ordered a series of tests,

9   including another chest x-ray, metabolic panel, urine culture, blood culture, HIV-serology,

10  monospot test, ESR, RA-factor exam, and anti-nuclear antibodies test. *Ibid.* Dr. Luca

11  visited plaintiff each day he was in the infirmary. *Ibid.* Plaintiff was discharged on

12  November 2, 2002, with numerous possible diagnoses, including collagen disease,

13  polymyositis (muscle inflammation), lupus, coccidioidomycosis (Valley Fever), atrial

14  mixoma with renal microemboli (kidney disease), and HIV infection. *Id.* ¶ 8; Feudale Decl.

15  Ex. E at 042. When plaintiff was discharged, Dr. Luca asked him to come back for a follow

16  up visit on November 5, 2002. Luca Decl. ¶ 7.

17      At plaintiff's follow up visit on November 5, 2002, Dr. Luca informed plaintiff that

18  some of the test results had come back, revealing that his chest and abdomen were clear,

19  heart was normal, and there was no swelling of his lungs. Luca Decl. ¶ 9. Dr. Luca also

20  informed plaintiff that blood was detected in his urine, his CPK (muscle tissue enzymes)

21  level was elevated, and an infiltrate (fuzzy image) appeared in an x-ray of his left lung. *Ibid.*

22  Dr. Luca confirmed that plaintiff had rhabdomyolisis, likely caused by doing push-ups. *Ibid.*

23  Based on the available results, Dr. Luca believed that plaintiff may have had collagen

24  disease or polymyositis, and asked plaintiff to return for another visit after the remaining

25  test results came in. *Ibid.*

26      On November 8, 2002, Dr. Luca discussed plaintiff's condition with Dr. Aung,

27  including the infiltrate on the x-ray of plaintiff's left lung. Luca Decl. ¶ 10; Aung Decl. ¶ 10.

28  Dr. Aung did not see plaintiff before plaintiff left the clinic that day, but confirmed with the

**United States District Court**
For the Northern District of California

1   pharmacy that plaintiff had received the antibiotics that Dr. Aung had ordered.  Aung Decl.

2   ¶ 10.  Plaintiff explains that on November 8, 2002, Dr. Aung called him to the infirmary, but

3   because the infirmary was crowded and plaintiff did not know why Dr. Aung sent for him,

4   prison officials ordered plaintiff to leave, with the understanding that he would be called

5   back if necessary.  Alls Decl. in Support of Pl's Mot. Partial Sum. J. ¶ 5 (docket no. 20).

6       On November 12, 2002, plaintiff returned to the clinic to see Dr. Luca and

7   complained of cramps when waking up.  Luca Decl. ¶ 11.  Dr. Luca examined plaintiff and

8   noted that his chest was clear, heart beat was regular, and temperature was normal.  *Ibid.*

9   At the time, Dr. Luca believed that plaintiff may have had inflammation of the muscles,

10  hematuria, collagen disease, or Valley Fever.  *Ibid.*  After the examination, Dr. Luca

11  prescribed the medication Augmenten to treat plaintiff's lung infiltrate and asked him to

12  return for a follow up visit on November 21, 2002.  *Ibid.*; Answer Ex. E at 048.

13      On his November 21, 2002, follow up visit to see Dr. Luca, plaintiff complained that

14  his chest was still bothering him.  Luca Decl. ¶ 12; Answer Ex. E at 048.  Dr. Luca informed

15  plaintiff that his blood test results had returned and revealed that he had contracted Valley

16  Fever.  Luca Decl. ¶ 12.  Dr. Luca advised plaintiff that he would be prescribed the

17  antifungal medication, ketoconazole (Nizoral), to take for six to nine months, starting with a

18  three month prescription, and ordered a liver function and cell count test to be performed at

19  a later date to check for possible toxicity to the medication.  *Ibid.*; Answer Ex. E at 048-49.

20      On November 26, 2002, plaintiff told Dr. Luca that he felt fine physically, but was

21  worried about his diagnosis because he had been informed that Valley Fever could cause

22  boils and requested a body scan.  Luca Decl. ¶ 13.  Dr. Luca physically examined plaintiff,

23  and did not notice any lesions on his body; plaintiff's spine appeared normal, his chest was

24  clear and no heart murmur was detected.  *Ibid.*  Dr. Luca also noted that plaintiff's last

25  catscan, performed on October 29, 2002, was normal and decided not to order any further

26  imaging procedures.  *Ibid.*  Dr. Luca informed plaintiff that in this stage of the disease, other

27  doctors may elect not to prescribe antifungal medications because of their adverse side

28  effects, but that he prescribed the ketoconazole because Valley Fever is known to be more

**United States District Court**
For the Northern District of California

1    aggressive in African American patients, such as plaintiff.  *Ibid.*  Plaintiff indicated that he

2    understood.  *Ibid.*

3        On December 26, 2002, a lab report with the results of plaintiff's recent liver function

4    test came back; Dr. Luca found that the test revealed that plaintiff had suffered significant

5    liver damage and had contracted chemical hepatitis due to the ketoconazole, as detected

6    by a threefold elevation of liver enzymes.  Luca Decl. ¶ 14; Answer Ex. E at 055.  Based on

7    medical literature which indicated that lung infections in healthy individuals, such as

8    plaintiff, can be managed without antifungal therapy, subject to close monitoring, Dr. Luca

9    planned to discontinue the antifungal medication, so long as plaintiff was feeling well.  Luca

10   Decl. ¶ 14.

11       On January 7, 2003, Dr. Luca saw plaintiff, who stated that he was feeling much

12   better, was always hungry, and had some pain above his navel.  Luca Decl. ¶ 15.  Upon

13   examination, Dr. Luca noted that plaintiff's temperature was normal.  *Ibid.*  Dr. Luca states

14   that based on these observations and plaintiff's toxicity to liver, he ordered that the

15   antifungal medication be discontinued and ordered another chest x-ray.  *Ibid.*  When Dr.

16   Luca told plaintiff that he would be taken off the antifungal medication, plaintiff stated that

17   he understood and did not protest or complain.  *Ibid.*  Plaintiff states that Dr. Luca informed

18   him that he was in remission, implying that plaintiff was not at any risk.  Pl's Opp. to Def.

19   Luca Decl. in Support of Mot. Sum. J. ¶ 3 (docket no. 38).

20       On February 11, 2003, plaintiff returned to the medical clinic complaining of swollen

21   lymph nodes in his groin area.  Luca Decl. ¶ 16.  Dr. Luca examined plaintiff and

22   determined that the lymph nodes were within normal size and were slightly swollen due to

23   an unrelated viral infection.  *Ibid.*  Dr. Luca informed plaintiff that his recent chest x-ray

24   results revealed that his chest was now normal.  *Ibid.*; Answer Ex. E at 057.  Dr. Luca also

25   noted that plaintiff had gained sixteen pounds in one month and had no fever.  Luca Decl. ¶

26   16.  Dr. Luca believed that it was prudent to discontinue the antifungal therapy based on

27   the resolution of the infiltrate in plaintiff's lung, his weight gain, and his liver toxicity.  *Ibid.*

28   Dr. Luca informed plaintiff of his decision and told him to come in as needed; plaintiff stated

United States District Court

For the Northern District of California

1   that he understood and agreed with Dr. Luca's decision.  *Ibid.*

2       On March 17, 2003, plaintiff was seen at the CTF medical clinic by Dr. Rosenthal,

3   who did not notice any progression of Valley Fever.  Luca Decl. ¶ 17; Answer Ex. E at 060,

4   062.

5       On May 8, 2003, plaintiff was seen at the CTF medical clinic by Dr. Dayalan, who

6   detected a nodule on plaintiff's left thigh and ordered a biopsy.  Luca Decl. ¶ 18; Answer

7   Ex. E at 065, 069.  The biopsy was conducted on May 12, 2003.  Luca Decl. ¶ 18; Answer

8   Ex. E at 065-66.  On May 19, 2003, the biopsy results revealed that the nodule tested

9   positive for Valley Fever, and Dr. Friederichs prescribed the antifungal medication

10  fluconazole (Diflucan).  Luca Decl. ¶ 18; Answer Ex. E at 073-74.

11      Dr. Luca states that after plaintiff's visit on February 11, 2003, plaintiff did not return

12  to see him regarding renewed symptoms of Valley Fever or any other reason, and that if

13  Dr. Luca had been made aware that plaintiff was again experiencing symptoms of Valley

14  Fever, he would have resumed antifungal therapy.  Luca Decl. ¶ 19.

15                          **STANDARD OF REVIEW**

16      Summary judgment is proper where the pleadings, discovery and affidavits show

17  that there is "no genuine issue as to any material fact and [that] the moving party is entitled

18  to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may

19  affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

20  (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a

21  reasonable jury to return a verdict for the nonmoving party.  *Ibid*.

22      The moving party for summary judgment bears the initial burden of identifying those

23  portions of the pleadings, discovery and affidavits which demonstrate the absence of a

24  genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

25  Where the moving party will have the burden of proof on an issue at trial, it must

26  affirmatively demonstrate that no reasonable trier of fact could find other than for the

27  moving party.  But on an issue for which the opposing party will have the burden of proof at

28  trial, the moving party need only point out "that there is an absence of evidence to support

8

United States District Court

For the Northern District of California

1   the nonmoving party's case." *Ibid.*  If the evidence in opposition to the motion is merely

2   colorable, or is not significantly probative, summary judgment may be granted.  *See Liberty*

3   *Lobby*, 477 U.S. at 249-250.  However, "self-serving affidavits are cognizable to establish a

4   genuine issue of material fact so long as they state facts based on personal knowledge and

5   are not too conclusory.*"  Rodriguez v. Airborne Express*, 265 F.3d 890, 902 (9th Cir. 2001);

6   *see also Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005) (in equal

7   protection case, conclusory statement of bias not sufficient to carry nonmoving party's

8   burden).

9          Once the moving party meets its initial burden, the nonmoving party must go beyond

10  the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that

11  there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  A dispute about a material fact is

12  "genuine" if the evidence is such that a reasonable jury could return a verdict for the

13  nonmoving party.  *See Liberty Lobby*, 477 U.S. at 248.  If the nonmoving party fails to make

14  this showing, "the moving party is entitled to judgment as a matter of law."  *Celotex*, 477

15  U.S. at 323.

16         At summary judgment, the judge must view the evidence in the light most favorable

17  to the nonmoving party: if evidence produced by the moving party conflicts with evidence

18  produced by the nonmoving party, the judge must assume the truth of the evidence set

19  forth by the nonmoving party with respect to that fact.  *See Leslie v. Grupo ICA*, 198 F.3d

20  1152, 1158 (9th Cir. 1999).  A court may not disregard direct evidence on the ground that

21  no reasonable jury would believe it.  *See ibid.*  (where nonmoving party's direct evidence

22  raises genuine issues of fact but is called into question by other unsworn testimony, district

23  court may not grant summary judgment to moving party on ground that direct evidence is

24  unbelievable).  The district court may not resolve disputed issues of material fact by

25  crediting one party's version of events and ignoring another.  *Wall v. County of Orange*, 364

26  F.3d 1107, 1111 (9th Cir. 2004).  "By deciding to rely on the defendants' statement of fact

27  [in deciding a summary judgment motion], the district court became a jury."  *Ibid.*  But

28  "[w]hen opposing parties tell different stories, one of which is blatantly contradicted by the

United States District Court

For the Northern District of California

1  record, so that no reasonable jury could believe it, a court should not adopt that version of

2  the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, -- U.S.

3  ----, 127 S. Ct. 1769, 1776-1777 (2007) (police officer entitled to summary judgment based

4  on qualified immunity in light of video evidence capturing plaintiff's reckless driving in

5  attempting to evade capture which utterly discredits plaintiff's claim that there was little or

6  no actual threat to innocent bystanders).

7      It is not the task of the district court to scour the record in search of a genuine issue

8  of triable fact. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party

9  has the burden of identifying with reasonable particularity the evidence that precludes

10  summary judgment.  *Ibid.*  If the nonmoving party fails to do so, the district court may

11  properly grant summary judgment in favor of the moving party.  *Ibid.  See also Carmen v.*

12  *San Francisco Unified School District*, 237 F.3d 1026, 1028-29 (9th Cir. 2001) (even if there

13  is evidence in the court file which creates a genuine issue of material fact, a district court

14  may grant summary judgment if the opposing papers do not include or conveniently refer to

15  that evidence).  Although the district court has discretion to consider materials in the court

16  file not referenced in the opposing papers, it need not do so.  *Id.* at 1029.

17                                    **DISCUSSION**

18      Plaintiff seeks partial summary judgment on his claims against Dr. Aung and Dr.

19  Luca alleging deliberate indifference to serious medical need.  For the reasons further

20  discussed below, plaintiff fails to demonstrate that either Dr. Aung or Dr. Luca acted with

21  deliberate indifference, and plaintiff's motion for partial summary judgment will be denied.

22  In the absence of a genuine issue of material fact as to the deliberate indifference claims,

23  defendants' motion for summary judgment will be granted.

24  **I.    Applicable Federal Law**

25      The Eighth Amendment requires that prison officials take reasonable measures to

26  guarantee the safety of prisoners.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

27  Deliberate indifference to a prisoner's serious medical needs violates the Eighth

28  Amendment's proscription against cruel and unusual punishment.  *Estelle v. Gamble*, 429

United States District Court

For the Northern District of California

U.S. 97, 104 (1976).  A determination of "deliberate indifference" involves an examination

of two elements: the seriousness of the prisoner's medical need and the nature of the

defendant's response to that need.  *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir.

1992), *overruled on other grounds, WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136

(9th Cir. 1997) (en banc).

A "serious" medical need exists if the failure to treat a prisoner's condition could

result in further significant injury or the "unnecessary and wanton infliction of pain."  *Ibid*.

(citing *Estelle*, 429 U.S. at 104).  The existence of an injury that a reasonable doctor or

patient would find important and worthy of comment or treatment; the presence of a

medical condition that significantly affects an individual's daily activities; or the existence of

chronic and substantial pain are examples of indications that a prisoner has a "serious"

need for medical treatment.  *Id*. at 1059-1060.

A prison official is deliberately indifferent if she knows that a prisoner faces a

substantial risk of serious harm and disregards that risk by failing to take reasonable steps

to abate it.  *Farmer*, 511 U.S. at 837.  A prison official cannot be held liable under the

Eighth Amendment for denying an inmate humane conditions of confinement unless the

standard for criminal recklessness is met, i.e., the official knows of and disregards an

excessive risk to inmate health or safety.  *Ibid*.  The official must both be aware of facts

from which the inference could be drawn that a substantial risk of serious harm exists and

have actually drawn the inference.  *Ibid*.  If a prison official should have been aware of the

risk, but was not, the official has not violated the Eighth Amendment, no matter how severe

the risk.  *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002).

In order for deliberate indifference to be established, there must be a purposeful act

or failure to act on the part of the defendant and resulting harm.  *See McGuckin*, 974 F.2d

at 1060.  A claim of mere negligence or harassment related to medical problems is not

enough to make out a violation of the Eighth Amendment.  *Gibson*, 290 F.3d at 1188.  *See*

*also Frost v. Agnos*, 152 F.3d 1124, 1130 (9th Cir. 1998) (finding no merit in claims

stemming from alleged delays in administering pain medication, treating broken nose and

United States District Court

For the Northern District of California

1  providing replacement crutch, because claims did not amount to more than negligence);

2  *O'Loughlin v. Doe*, 920 F.2d 614, 617 (9th Cir. 1990) (repeatedly failing to satisfy requests

3  for aspirins and antacids to alleviate headaches, nausea and pains is not constitutional

4  violation; isolated occurrences of neglect may constitute grounds for medical malpractice

5  but do not rise to level of unnecessary and wanton infliction of pain).

6  **II.    Analysis**

7        To support his deliberate indifference claims, plaintiff contends that Dr. Aung failed

8  to properly diagnose his illness as Valley Fever and initially treated it as a cold, in part

9  because of budget considerations, and that Dr. Luca ended the treatment prematurely

10  against plaintiff's protests, also because of budget considerations.

11        In order to establish liability, plaintiff must demonstrate both the seriousness of his

12  medical need, and defendants' deliberate indifference in response to that need.  *See*

13  *Estelle*, 429 U.S. at 106.  Defendants concede that plaintiff had a serious medical need,

14  based on his symptoms, the hindrance on plaintiff's daily activities, the hospitalization

15  required by the illness, and the potentially harmful side-effects of the treatment, thus

16  satisfying the serious medical need requirement for liability.  As to the deliberate

17  indifference requirement, however, plaintiff has not demonstrated that either Dr. Aung or

18  Dr. Luca knew of a significant risk of harm to plaintiff and consciously disregarded that risk.

19  *Farmer*, 511 U.S. at 837, 839.

20        **A.    Dr. Aung**

21        Plaintiff alleges that when he was seen by Dr. Aung on October 28, 2002, he

22  complained of chest pains, dry cough, headaches, and bone aches.  Am. Compl., Attach. at

23  4.  Plaintiff contends that Dr. Aung should have ordered a blood test, admitted plaintiff or

24  ordered a follow-up, but instead treated plaintiff's symptoms as a cold and referred him for

25  mental evaluation.  Pl's St. Disputed Factual Issues ¶¶ 2, 3.  Plaintiff further contends that

26  Dr. Aung provided inadequate medical care due to budget concerns.  Alls Decl. in Support

27

28  of Pl's Mot. Partial Sum. J. ¶ 1.  However, the record contains uncontested evidence that

United States District Court

For the Northern District of California

1   Dr. Aung treated plaintiff and prescribed medication on October 28, 2002.

2         Viewing the facts in the light most favorable to plaintiff, the record demonstrates that

3   Dr. Aung treated plaintiff for possible bronchitis or pneumonia, as well as cough and fever,

4   based on available test results and observable symptoms before a blood test determined

5   conclusively that plaintiff had Valley Fever about three and a half weeks later.  There is no

6   genuine issue of material fact as to whether Dr. Aung knew of and deliberately disregarded

7   the substantial risk of serious harm to plaintiff's health when he treated plaintiff on October

8   28, 2002.  Plaintiff's lay opinion disagreeing with the course of treatment prescribed by Dr.

9   Aung does not raise a triable issue.  *See Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir.

10  1981); *Toguchi v. Chung*, 391 F.3d 1051, 1059-60 (9th Cir. 2004).  Furthermore, the

11  evidence contradicts plaintiff's allegation that Dr. Aung was motivated merely by pressure

12  to cut costs: Dr. Aung ordered a chest x-ray, prescribed three medications to treat plaintiff's

13  symptoms, including antibiotics for possible bronchitis or pneumonia, and referred plaintiff

14  for a mental health evaluation to rule out mental disorders because of his multiple

15  complaints about his health over the past six years.  *Cf. Jones v. Johnson*, 781 F.2d 769,

16  771 (9th Cir. 1986) (where record contained no explanation for denying surgery other than

17  budget concerns, failure to treat solely due to budgetary constraints is adequate to allege

18  deliberate indifference).  Thus, in the absence of a genuine issue of material fact, Dr. Aung

19  is entitled to summary judgment on plaintiff's claim of deliberate indifference.

20        As the evidence does not establish that Dr. Aung was deliberately indifferent to

21  plaintiff's medical needs, plaintiff's motion for partial summary judgment on this claim will be

22  denied.

23        **B.    Dr. Luca**

24        Plaintiff alleges that Dr. Luca intentionally disregarded plaintiff's serious medical

25  needs and personal safety by taking him off the antifungal medication prematurely, due to

26  pressure to cut costs.  Am. Compl., Attach. at 8.  Viewing the evidence in the light most

27  favorable to plaintiff, there is no evidence to indicate that Dr. Luca's decision to discontinue

28  the antifungal treatment amounted to deliberate indifference to plaintiff's condition.  At

United States District Court

For the Northern District of California

plaintiff's November 21, 2002, visit to the CTF medical clinic, Dr. Luca informed him of the blood tests indicating Valley Fever, and advised him that he would prescribe a six to nine month course of antifungal medication, subject to testing for side effects of liver toxicity. When a lab report on plaintiff's liver enzyme level revealed liver damage and chemical hepatitis, Dr. Luca decided to discontinue the antifungal treatment and manage the Valley Fever without antifungal therapy.  Before discontinuing the antifungal medication, Dr. Luca examined plaintiff on January 7, 2003 and noted that plaintiff stated that he was feeling much better, was always hungry, and had normal temperature.  Plaintiff complained of some pain above his navel, and Dr. Luca ordered another chest x-ray.  Dr. Luca saw plaintiff again on February 11, 2003, and advised plaintiff of his decision to discontinue the antifungal therapy.  Dr. Luca's course of treatment demonstrates that he responded reasonably to plaintiff's medical needs under the circumstances, "even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.  Even assuming as true plaintiff's allegations that Dr. Luca discontinued plaintiff's antifungal medication "despite his pleas that he still had symptoms," Dr. Luca acted reasonably in light of plaintiff's liver toxicity, and addressed plaintiff's complaints of pain by ordering another chest x-ray, which revealed that his chest was normal and that the infiltrate in his left lung was resolved.

There is no evidence to support plaintiff's allegation that Dr. Luca's decision to discontinue the ketoconazole was due to budgetary constraints, rather than a medical decision to treat plaintiff without antifungal medication based on the onset of liver damage and indications that plaintiff's health had otherwise improved. *Cf. Jones*, 781 F.2d at 771. Plaintiff's allegation that Dr. Luca prescribed ketoconazole instead of Diflucan in order to save money does not raise a triable issue as to deliberate indifference in light of plaintiff's admission that "ketoconazole is the oldest of the three approved oral anti-fungal medications."  A difference of opinion between a prisoner-patient and prison medical authorities over which medication to prescribe does not give rise to a deliberate indifference claim. *See Franklin*, 662 F.2d at 1344.

United States District Court

For the Northern District of California

1    To the extent that plaintiff alleges that Dr. Luca failed "to continue to do follow up lab

2 work to ensure the level of the Valley Fever did not increase," such allegations may

3 establish, at most, negligence, but do not establish that Dr. Luca knew of a substantial risk

4 of serious harm and disregarded that risk. *Farmer*, 511 U.S. at 835 ("*Estelle* establishes

5 that deliberate indifference entails something more than mere negligence").

6    In the absence of a material issue of fact that Dr. Luca was deliberately indifferent to

7 plaintiff's serious medical needs, Dr. Luca is entitled to summary judgment on plaintiff's

8 claims.  As the evidence does not establish that Dr. Luca was deliberately indifferent to

9 plaintiff's medical needs, plaintiff's motion for partial summary judgment on this claim will be

10 denied.  Because the court has decided the merits of plaintiff's claims, the court will not

11 reach defendants' qualified immunity argument.

12    Furthermore, plaintiff's motion for appointment of counsel is denied.  *See Terrell v.*

13 *Brewer*, 935 F.2d 1015, 1017 (9th Cir. 1991).

14                                   **CONCLUSION**

15    For the foregoing reasons, the court orders as follows:

16    Defendants' motion for summary judgment is GRANTED.  (Docket no. 31.)

17    Plaintiff's motion for partial summary judgment is DENIED.  (Docket no. 19.)

18    Plaintiff's motion for appointment of counsel is DENIED.  (Docket no. 17.)

19    The clerk of the court shall enter judgment in favor of defendants and against

20 plaintiff, terminate all pending motions and close the file.

21    **IT IS SO ORDERED.**

22

23 Dated: September 18, 2008.    _____

24                                   PHYLLIS J. HAMILTON
                                    United States District Judge

25

26 G:\PRO-SE\PJH\CR.05\ALLS901.MSJ.wpd

27

28